Good morning, Your Honor. I'd like to reserve four minutes for rebuttal. My name is Al Flora, counsel for the appellate Mark Ciavarella, Jr. As I'm sure the Court is aware, these convictions arise out of a series of payments made to two state court judges regarding or relating to the use and construction of two juvenile detention facilities. We are well aware of the facts. The first issue I would like to address is the issue of disqualification of Judge Kozik. And I'd like to preface my remarks by saying that Judge Kozik has led a long and distinguished career. Could you either raise the mic or speak up a little bit? Judge Kozik has a long and distinguished career in service to the judiciary, and he is well respected. But the distinction of his career, his subjective intent, is not the standard under 455A by which we judge disqualification. It's a reasonable person. It is a reasonable person standard. And whether a reasonable person would harbor doubts about Judge Kozik's impartiality. In this particular case, there are a number of things, a number of facts, which would raise questions about his impartiality. The first is shortly after the entry of a plea to conflict of interest type on a services fraud, Judge Kozik began receiving and received over a year and a half, over 147 letters, which he later described as public outrage letters. With regards to some of those letters, he wrote back, expressing his personal opinion that he was in agreement with those letters while the case was pending before him. None of those letters. But he also, I mean, that is true, he expressed personal sentiment, but at the same time, he said, but I have to look at the PSR. But the government urges that I should accept this because they can't prove count one. But if personal opinion were all that I went on, I mean, you're right, they'd express a personal opinion, but your statement is not fully accurate if you don't look at each one of the letters and judge them independently based on their content. He does say that, Your Honor, but the issue is not his subjective intent. It's how a reasonable person would look at those letters. And what's troubling about this case, and I've never seen this before, is he never disclosed the letters or his responses until well after the case was over and shortly before sentencing. One in a hearing addressing the probation report, the objections there, too, he disclosed Well, there's no doubt that he should not have done what he did, should not have written letters, first of all. And then, query what do you do? I mean, when I was a district court judge, you know, sometimes you receive letters, and sometimes, you know, because they have no bearing on it, they're not relevant at all. Do you put them in a file? Do you throw them away? Do you send them to counsel saying, I received this letter? I mean, there is no indication in the count as to what a judge should do. I'm sure Judge Kosig would be the first to say he wished he had, you know, not responded to them. But the issue really is whether his impartiality would reasonably be questioned. And we have here a situation that isn't an extrajudicial situation. It's not he's on the board of a college that's the plaintiff in the case, you know, the defendant in the case, who doesn't harbor a deep-seated animus arising from a personal situation. I mean, this is a very contextual situation involving the case before him. So it's difficult. I'm just posing to you some of the yes thoughts, but continue with your argument. It is difficult. In 455A, when you're making disqualification arguments, it's very fact-driven. Which troubling is, before the sentencing, shortly before, when he discloses for the first time about all these letters, he tells counsel for the government and the defense that he did not read any of the letters. And yet we find out the day of sentencing, that morning, where in fact he had made responses. He had expressed his personal opinions. And that's what brought a recusal notion at that point in time. The focus is on whether he exhibited some, harbored doubts about, or we harbored doubts about the judge's impartiality. What did he say, though? I've been going through the letters, and as Judge Rundell pointed out to you, he generally says, you know, we still have to hear the case, and the jury has to decide, and it may, you know, this is a slow process, but it'll work out. Hope you get satisfied in the end. What was the worst thing that the judge said in these letters? The worst thing I think the judge said in the letters is when in response to, I believe it's the Wojak letter. Wojak? Yes. February 20th? Yes. My personal opinions are in complete sympathy with those you expressed. And those... The only difference is that my personal beliefs cannot guide my responsibility and judgments. What's so good about that? His personal opinion was that he agreed with the people that Mark Schivarella was using his courtroom as a business. But then the second sentence, I mean, in context, the second sentence... He does, but what you're referring to there is his subjective intent versus looking at it from an objective standpoint. Except he had gotten in January, I mean, the statement, connection with the guilty plea, is a recounting and an admission of all of these things. Filed February 12th, 09. That's pretty strong. That is very strong admission that these things were done and were admitted to have been done. And for you, for a judge to not have a personal view that this is really pretty bad, I'm trying to put myself in that position. And we're being disingenuous and we don't realize that when judges... I mean, that's the most common question that's asked of us. Do you ever make a ruling that you are sorry you have to make because you have a view that's different every day? Because everybody has views. I guess that's the problem we have here. I think if I could take it a step further, you have two additional situations early on... And let me add, if we were to find he should have recused at some juncture, what is the remedy? Is it a harmless error situation? What is the remedy? I think the remedy in this case would essentially be a new trial. I'm sorry, what is that? A new trial. A new trial. Well, can I ask you, you actually don't ask for anything as to the tax count. Wouldn't that also have to be vacated? Well, I think it would, given the argument on recusal, because obviously if his impartiality could be reasonably questioned, that goes overall to the sentencing as well. And even though Mark Chivarella admitted to the tax violations, you still have a sentencing issue. There's two other matters on the disqualification that I would like to briefly get to. The first is, if you look very closely at his opinion in which he rejected the initial plea agreement, you'll see in there that he refers to public comments that Mark Chivarella made denying the existence of a quid pro quo. The record that existed at that time did not contain any public comments relating to Mark Chivarella having made, from which I think you can draw an inference that apparently Judge Kozik may have been reading the newspapers and may have been saying things that Mark Chivarella was making in the public. But was there an acceptance of responsibility as part of the plea agreement? It was an acceptance of responsibility as part of the plea agreement. And despite that acceptance of responsibility, it was rejected based upon alleged public comments that Mark Chivarella was making. Well, that is a public comment, isn't it? I mean, if he makes a statement on the record in support of a plea of guilty, why can't the judge make reference to those comments? The public comments that we're referring to is public comments denying the existence of a quid pro quo. Those public comments were not on the record anyplace. He had to acquire those from some extrajudicial source, from the media most likely, but we What if he was just mistaken? I mean, he didn't cite anything. He didn't cite anything, but he utilized that as the basis for rejecting a plea agreement. Well, he got, he rejected the plea agreement two days after getting the PSR, and I thought he made it pretty clear that it was, that the PSR was extremely instrumental when it said 168 to 210 months, and he wasn't going to accept an 87-month agreement, but I'll go back and look at that again. I think the other thing on the disqualification very quickly is that the statements that were attributed to him by the media, and we had asked for an evidentiary hearing to determine whether in fact Judge Kozik made those statements. And the problem with those statements are, if Judge Kozik in fact referred to Mark Chivarella as engaging in judicial prostitution and labeling him with the slogan, kids for cash, that would suggest some type of serious animosity. But I thought they were found to not have been properly attributed. Judge Kozik made that ruling on the basis of citing to the filings that were of record at that point in time. If you go to the filings at that point in time, you're not going to find anything in those filings, which is the plea transcript of Miracle, the plea transcript of Powell, the plea transcript of Chivarella, using the words judicial prostitution, using the words kids for cash. Those terms are not used. And yet the reporter is referencing him utilizing those terms in some extrajudicial comments outside of an elevator. That's the argument on disqualification. The judge himself denied it though, right? The judge himself denied it. I mean, are you suggesting that judges then have to submit to an examination by the lawyers if you don't agree? What I'm suggesting is that sometimes where an issue is so fact-driven, as this one was, relating to whether those particular comments were made, that the better approach would be to assign the matter to another judge. You're talking about the statements in the media, are you? What's the bigger part of your honor? Are you talking about the statements that were ignored in? Yes, I am, your honor. Yes, I am, your honor. Okay. I don't know if you finished. I do have a follow-up. The better approach is to assign it to another judge. Better approach. Okay. Better approach, but does that mean that his rulings, that we basically reverse his refusal or denial of disqualification? I think in light of the nature of the alleged comments that were made, these were not offhand remarks. These went to the very heart of the case. But if the judge denied making the remarks, the problem is that then you are reacting to every newspaper report, maybe a blogger on the internet makes a comment about a judge, and that itself would be sufficient to trigger a request for hearing? Is that your response? No, it's not. I don't think every time there's a blogger on the internet that we automatically remove for recusals. But in this particular case, when you look at the report that was given, it was so fact-specific, the words were very clear that were being utilized by the reporter, that you had really a question of credibility between the judge and this reporter as to particular information. How do you resolve that in a case of this magnitude? Cheney's case doesn't support what you're saying, I don't think. You had a justice respond to it, and that was it. I don't think I read any language in Cheney that said there's a right to a hearing. There is, and quite frankly, the canon of judicial conduct don't require a hearing. You look at a number of the cases we cite, some courts have held hearings before different judges, others have not. There's no clear guidance on any of this. Are you contending that there were, how long was this trial? Trial was about six, seven days in total. Are you contending that there were rulings made by the judge that were a result of bias? I am, Your Honor. Which ones? I think there's a number of them. That's not in your brief, and it's not all that relevant, but we have to look at the overall context and see whether injustice occurred here. That's not the test. It's whether impartiality should reasonably be questioned. But if we're on the fence on that, it might tip what the remedy should be by us taking a second look. And that goes into the cross-examination confrontation of Robert Powell and Mr. Owens. We had laid out in an opening argument of defense that Mr. Powell had engaged in a bezelment scheme and that to attempt to cover up that scheme and deflect his taking large sums of money from various companies in which he had an interest and using it to support a lavish lifestyle, that there was no extortion conspiracy. He was making this up. Okay. But you got a lot of that evidence in. You got, you know, they had visa bills of $21,000 a month, and I didn't see in your briefing or anywhere an offer of, had we been permitted to continue, we had these bombshells that we would have used, and because we couldn't use them, and I must say you're now making really a Sixth Amendment argument, which wasn't made below. Because we couldn't use them, then he didn't have the right to a complete defense. Where do you tell the district court, you know, if you don't let us do this, you are denying his Sixth Amendment right, and this is what we want to show? I mean, I just don't see that. Add another eight minutes, would you please, Michael? Thank you. We made the argument in a number of proffers. The first was when we began cross-examination of Mr. Powell, and it was after the government elicited from Powell what they described as the legitimacy of all these withdrawals from these various companies. When we started to get into that, and started to question him, the judge on his own interjected and cut us off. The second time was with regards to Mr. Owens. The prosecution put him up, asked him questions about changes in Powell's demeanor to suggest that Powell's demeanor had changed because of the conspiracy extortion. Why was it an abuse of discretion, though, to cut you off? I mean, by then you had already made the point that he had been embezzling money from his law firm. We had not at that point. We had just started to question him about a few of his expenditures when we were cut off. It was very early on in the game. And then when we went to Owens and the government brought out about the change in Powell's demeanor, we wanted to cross-examine Owens, that the change in the demeanor was related to the embezzlement of funds and not this conspiracy extortion scheme. Of course, all that related to the extortion issue, and that he was found not guilty of extortion. But you still have the conspiracy charges. You're saying that had you been able to pursue that, the outcome on the conspiracy charges would have been different? Yes. Plus, you also have the honest services mail fraud charges for which he was convicted. And some of those charges rise out of the Powell payments. You know, I noticed that you've got a number of concurrent sentences here, 240 months, and you only attack some of them. I'm wondering if you don't succeed on the recusal issue, I mean, where does that get you exactly? I mean, a couple of those get knocked out, you still have a 240-month sentence. Quite frankly, to knock out just the honest services fraud counts for the sake of argument and the recall is left, it does not get us too far, I'll be quite frank with you. Getting back to the cross-examination of Owens, we were cut off. One of the interesting things there is that the government prosecutors themselves went up and told Judge Kozak, Judge, they have an absolute right to question this witness on these matters relating to the change in demeanor. Well, can I stop you for a minute, because I think we got into this, because Judge Rendell asked you, give us an example of bias. I think what you're getting at, and I might agree with you, is that, if anything, it just shows maybe a misunderstanding of what the nature of what you were trying to get at. So, I mean, does that show bias or just maybe a misunderstanding of what, maybe a judge's misunderstanding as to what you were trying to do? I don't think there was any misunderstanding there as to what we were trying to do. I think the record is clear, especially when you get two experienced prosecutors up there explaining to the judge that, look, they have an absolute right to show that, you know, his change in demeanor is a result of stealing money from the companies. So they were very clear on that. There was no misunderstanding on that. The third issue I'd like to get to is the, relating to the statements made by the assistant U.S. attorney at the plea hearing of Robert Mirabal. In a different case. In a different case, but relating to the same payments. But relating to the intent of someone else. Well, it related to the intent of Robert Mirabal as to the payments that he was making to Chivrella and Conahan. And in that particular plea hearing, the government prosecutor indicated to the judge that there was no quid pro quo as to the payments Mirabal made to Chivrella and Conahan. But even if that's an error, all right? But didn't you mention it in both your opening and closing statements? I mean, isn't that harmless? It is not harmless. We mentioned it in the opening. And in the closing, we made reference to Mirabal's testimony in the trial where he acknowledges that he did not pay a bribe or a kickback. But it is not harmless error. But was it the explanation that that was a statement from the perspective of Mirabal? In other words, it might be true as to Mirabal's vendrea, but not true as the government contended with respect to Chivrella? That's the government's contention. But if you look at the transcript, you'll see where the government says there was no quid pro quo. And we based that on investigation and research into what Mirabal's intent was. So what the government is doing in that hearing is they're telling the court, look, we've looked at these payments. There's clearly no quid pro quo. Here's why we arrive at that decision. We should have been allowed to introduce those statements as a party admission, which would be substantive evidence. It's not a party admission in their case. If the government says something, another case that might have bearing with how they might view another case, you can bring it in. I mean, the two are separate. I don't see how you say a party, it's an admission of a party. It wasn't a party in your case. How do you bridge that gap? You bridge the gap by basically saying that you have two inconsistent theories being offered by the government relating to Mirabal's payments to Chivrella and Conahin. In the Mirabal plea hearing, the argument is, and what is being said, is that there's no quid pro quo as relating to those payments. But is it really inconsistent? Again, as Judge Fuentes said, you're talking about what's in the mind of one gentleman, not necessarily characterization of everybody's thought. It was only Miracle's thought. It was only with respect to Miracle, not everybody. And is it truly inconsistent? It is. When you look at the unequivocal statement by the prosecutor where, based upon what they've looked at in terms of Miracle, they reach that conclusion, there is no quid pro quo. Had we been able to introduce that into substantive evidence, we would then probably have asked for a jury instruction on party admissions. There's no quid pro quo as to Miracle, but there was quid pro quo as to Chivrella, and that's what they were proving. So there is an inconsistency. Why is that wrong? Well, there is, okay, in the sense that what they were talking about in the Miracle plea hearing related to Miracle's specific intent and the conclusion of the government, that based upon his intent, there was no quid pro quo. Bribery, you look at both the intent of the payor and the intent of the person receiving the money, and you have to have that mutuality, that connection to establish a bribe. That is why in the Miracle plea hearing what was said, it was so important to bring that in to Chivrella's trial. Except you only had one half of it. You had the Miracle half, not the other half. My time is just about up. Thank you. All right. Thank you very much. May it please the Court, my name is Gordon Zubrod, and I am an Assistant United States Attorney for the Middle District of Pennsylvania, and I'd like to go, regardless of going over the facts, I'd like to go right to the issues raised by my colleague, Mr. Filora, on the issue of recusal. He basically says that there are three bases for which there is a bias shown by the Court. The first one is the four letters that he returned. The second one is the rejection of the plea agreement, and now he brings up the certain other rulings which, if the Court requires, I will address. And the third one is that the statement to the – allegedly he said it was a statement – he spoke to a reporter when it appears from reading the context what was said, that the reporter overheard a conversation with a private party. But let me take them in the sequence that were raised by Mr. Filora. First, regarding the four letters. The four letters clearly come from no external sources, no information gathered from that. Essentially what he says, I appreciate your views, I'm in sympathy with your views, but – and this is a quote – my personal opinion – he said, my personal beliefs cannot guide my responsibility and judgments. I need to determine if the government's reasoning is correct, and I must do so in as detached a manner as possible. He also said statements such as that in the Kazakh letter, your statements are similar to allegations that have been made. Note that this is after Judge Shvarela and Judge Conahan entered pleas of guilty, and then he got these over 100 letters. And then in the Cressman letter he said, I'm sorry that justice is so slow, but ultimately I hope that you find it to be true. Those aren't even statements of opinion. The problem is the collection of letters and statements that he made. If he says, my personal opinions are in complete sympathy with those you express, I don't have what he – what the writer expressed, but I suspect it was antagonistic towards the defendant. My personal opinions are in complete sympathy with yours. So he's aligning himself now. But having said that – Opinions against Shvarela. Then he has another letter where he says, if personal opinions were our only guide, we are on the same page. So he's agreeing, once again, with somebody who's writing against the defendant. What about those comments? Oh, I think you have to read, as Judge Rendell said, you have to read the whole letter. When you look at it in context, he says, but I am not going to allow those personal opinions to affect my view. Well, I think what he's saying, I really don't like this guy, but I'm going to be fair. I think that's reasonable. You think that's reasonable? But if the information, if the court's conclusion about an individual derives from the court proceedings, then there's nothing wrong with the court saying, look, based upon the facts, I'm in sympathy, but I'm not going to let that affect me. If you look at the cases, there are basically three cases that talk about the issue of recusal in the Third Circuit. There's Haynes-Liggett, there is Antar, and there is, I think it's Bertoli. In the Haynes-Liggett case, you have a judge who, it was an appeal from a magistrate's findings. The judge was supposed to look at the findings and determine whether or not there was a basis for what the magistrate found. Instead, the judge ordered them to produce in tobacco litigation every opening and closing statement ever made by the tobacco companies. And then he said, prior to any trial or anything, he said, the tobacco industry may be the king of concealment and disinformation. And the court said, you're getting information from outside of the record, that's impermissible, and you're expressing an opinion as to what the result ought to be. The same thing happened when you deal with the case of- But is the judge's sympathy, you know, assume the judge in all these cases says, but I'm going to be neutral. Does that cure every one of these cases? You know, the judge makes some sort of a gut call as to what he sees and then says, but I'm going to be neutral. Is that all that a judge has to do to pass through this? I wish I had a dollar for every time a judge would look over at victims standing before him and say, look, I'm in complete sympathy with what you've been through, with your feelings toward the defendant, but I've got to make my decision based on the facts of the law. That's okay at sentencing, isn't it? Pardon me? That might be okay at a sentencing proceeding, but we're talking about pretrial comments before the judge has even started to hear the case. These are post-plea comments, not pretrial at this point. And if you look at the Fourth Circuit says, a judge's critical and strongly worded comments regarding coaching of witnesses is not a basis for recusal. The Fifth Circuit said, a judge's unfavorable but legally sound opinion of a defendant is not a basis for recusal. You know, the difficulty here is that these letters are saying, throw the book at them. This is really, really serious. And when a judge sentences someone, the judge has a lot of discretion. And as much as you say, you know, I divorce my views from, you know, my personal views, when it comes to sentencing, that's when the personal views and the, I agree with you, it's hard to slice and dice that as I'm just being fair. Why should we not grant a resentencing here? That's the one area where, I mean, the jury found no objection to jury instructions here. You know, there's an allegation about sufficiency of the evidence, but assuming the evidence is there and the jury found what it found. But when it comes to sentencing, the judge has that ability to, now granted the PSR said life, but, you know, how are we not to know that another judge might have said, you know, 168 to 210 is enough. All this relevant conduct, et cetera, et cetera. Why not resentence? And why isn't this a little different because of the sentencing aspect and that was the import of the letters? Well, point taken, that does this require a resentencing? I think you have to take a look at, supposing those letters had never been written either to the judge or from the judge, what evidence would he be looking at? You cannot read the pre-sentence investigation without seeing how scalding it is. You think that those letters were scathing? You can read the pre-sentence report and it confirmed, and the judge basically is talking about statements of the judge. We're not talking about what's in a pre-sentence. Well, again, I have to go back to the statement of the judge saying, look, I understand your feelings, I sympathize with your feelings, and if it were only my personal feelings that might affect the outcome, but it's not going to affect the outcome. I think we have to take the court at its word when it said, my personal opinions are not going to be a part of this decision, and I'm going to hold the government to its test. But when it comes to sentencing, that decision of where to go between, say, a 168 and life, could very much be impacted by the fact that he's gotten a letter saying, throw the book at him, and he's expressed to them, you know, personally, I couldn't agree more. Of course, he departed below the guidelines, and if a sentence within the guidelines is presumed substantively reasonable. He had the maximum statutory, didn't he? No, he did not. Oh, because of concurrent? He ran them concurrent, and he also gave a sentence. He could have given life. He gave a sentence below the guideline range. So if there's a presumption that attaches to a sentence within the guidelines, there ought to be a presumption that attaches to one below the guidelines. And also, I think you have to look at the record and see was there sufficient basis for the judge to draw the conclusions that he drew at time of sentencing. Well, now, if we happen to find that there should have been a recusal, can we just send it back for resentencing, or do we have to start over? Well, it depends. I'm sorry, Judge. It depends upon the point at which you find that there was a necessity for a recusal. If it is simply an opinion as to the nature of the sentence the individual is going to be received, assuming you found that to be over the top, then I would think it would have to go back for resentencing. To another judge? Yes. If there's an animus that, as they say in the Antar case, the judge said at time of sentencing, from day one, my goal was to take you out. Well, his impartiality could clearly be questioned there. Right. If you find that the judge did that, but it's not here in this record. You know, animus is a good word to use, I suppose, because if you start from the very beginning, that is the letters, and then you go on through the statements in the media, and the fact that the letters were not disclosed until after the case, and that he said, I didn't read those letters, but in fact apparently he did. Well, he said. If you put everything together, does it not show that the judge had a very strong animus against this defendant? Well, again, I think you have to look at the other allegations that are made. It seems to me, I mean, if you look at the reporter's statement, I think that's where we're going with your question. If you look at the reporter's statement, I should say that by the time that statement allegedly was made, and we're not quite sure what it is, because at one point when the word quid pro quo comes up, the reporter, who is editorializing all over this, he puts that in quotes. When you get to the word prostitution, it's not in quotes. When you get to the word he dissected the flawed logic of Chivarella's reasoning, that's not in quotes. It seems to me that you've got a reporter editorializing. As Judge Kozik points out, most of the article quoting him came directly from the memorandum rejecting the plea agreement. Of the presidency memorandum? Or his own memorandum? The memorandum rejecting the plea agreement. So that's his statement, isn't it? Isn't that the judge's statement? It is the judge's statement. So the quotes are essentially coming from the judge's own statements as reflected in his memorandum. Yeah. And those statements are derived from his review of the record, his review of the pre-sentence report, his having taken guilty pleas from numerous individuals. So you cannot come back and say that the statements... I mean, he says that Chivarella sold his office. That's based upon the record. That shows a low opinion of Chivarella, but it doesn't show a bias or an animus towards him. And I think that's the key issue. Judges can come to some pretty hard conclusions about the actions and the character of individuals based upon the evidence that is presented to them. And there is nothing wrong with them commenting upon that. Didn't the judge say, despite the fact that he got so many letters, he only responded to some because of a concern about bias? And didn't we, in our Selkridge case, as a Virgin Islands case, comment on the inconsistency of that, where some cases you'd be recused from but not others? Are you referring to the letters that he received that he answered some and did not answer others? He said he didn't do any more because he didn't want to seem biased. Correct? Yes. And notice, he released those letters right at the right time. Judges never release letters until it's time for sentencing. That's when they come out. That's when he released them. I don't know. I think your friend says that he had said there was nothing like that. He hadn't looked at them, and then he doubled back after. Well, what does he mean by that? I mean, to look at, one could easily infer that he meant, I haven't looked into these. Well, he wrote back on some. What did he specifically say in that, like, did he didn't pay attention to them or that he didn't answer them, or what did he specifically say? He said, as I recall, I haven't looked at them. He says, I received approximately 170 letters, I haven't looked at them. According to Mr. Flory, he had looked at them. Not only did he look at them, he responded to them. Right, but then he turned over the letters and he turned over his responses to them, so he's not trying to hide the ball from anybody. He turned everything over to them. Now, if, you know, I don't think you can hang this case upon a judge who makes a full disclosure and then find out that his initial statement about it does not comport with the fullness, is not as full as the disclosure he makes. Now, this comment to the judge. This is difficult. Judges judging judges who are judging judges. Right. It's very tough. What about Mr. Flory's point about the restriction of cross-examination? Because he said that was some evidence that there was bias against his client, so that he didn't allow him to explore an issue that was quite viable, and the U.S. Attorney agreed that it was a viable issue. Well, by that time, as I'm sure as you've seen in court, at some point you start to protect your record. And we cited no cases for our position. It was an attempt to protect the record and present a clean record for appeal. On the theory of let the defense go wherever they want to go, they're going to get convicted anyway. Well, on that issue, because it was a loser. Because this was the issue where both Powell, who was the owner, and Owens, who was the chief financial officer, we presented records showing that everything that Powell had taken out of the business was recorded and was on the books for anybody to see, including the cash that he took out to pay to Shivarella. Was that before the jury? It was, yes. Owens testified to that. We had the records. We turned the records over in discovery. We had the records that he testified from. His embezzlement from his law firm? Pardon me? His embezzlement from his law firm? Embezzlement was not, and I think the court properly kept that out. The court didn't actually keep it out. If you read it, the judge says, wait a minute, how is this relevant? That's what the defendant was trying to show, that it wasn't bad. Well, when he was asked how is it relevant, how is embezzlement relevant, if it's not tied to the money that was paid to Shivarella? Because you recall, Shivarella took the stand, and he admitted exceeding all of the money except for the cash. So the judge says, supposing he's embezzling, how is that relevant to whether or not he paid that money to Shivarella? And the response, when that was done during Powell, the response was, Your Honor, we're trying to show that, how did he put it? We're trying to show that Mr. Powell was too rich to have been extorted. And the judge said, that's ridiculous. He said, a rich person can't be extorted. And the allegation... The explanation was a little clearer when it came to Owens, right? Yes, they cleaned it up more. But essentially, what the judge essentially left open for them, show me how it's relevant. They never made an offer of proof. They never put anything on in their case in chief. In essence, it was a fishing expedition, and it was an attempt to dirty up Powell so that they would think, he's got too much money anyway. You shouldn't convict Shivarella. And notice that Shivarella was acquitted of those counts, which indicates that that argument had some force with the jury. Finally, the other issue that was raised, I believe it was, on the admission. Michael, add some more time. Add four more minutes, and we'll let you do it. The question on the admission by a party opponent, three responses to that. It's not in our brief, but I went back and I read the transcript again this weekend. And that admission that we're fighting over, it did make it into the record. It came in during the cross-examination of Mericle at page 462 through 464, and particularly at page 464. Mericle had testified, and on cross-examination he was asked by Mr. Flora, and as I recall the question, at your guilty plea the statement was made that you had no criminal intent. He said, yes. He said, and that wasn't your statement, was it? That was Mr. Zubrot's statement, the prosecutor's statement, who said that, yes. And you simply agreed with him, yes. So the admission actually came in. But even if the admission had not come in, they were not inconsistent with each other. What was said about Mr. Mericle, that he had no criminal intent, Mr. Mericle testified to in the case in chief against Shiverella. He said, in my mind, there was nothing illegal about it because I split fees all the time. I give finder's fees all the time. I didn't think there was anything wrong with it. But the fact of the matter is that payment of the money was part of a larger conspiracy because the money, Shiverella directed that it go through Powell, the owner. Powell received a 1099. Powell paid the taxes on it. Then Powell paid the money over to Shiverella and Cunningham. Why did he do it? He said, I did it because I wanted to, without paying it, I would not have gotten juveniles in my facility. So that payment of that money, as to Powell, was very much the payment of a bride. Moreover, Shiverella split the fee with President Judge Cunningham because Judge Cunningham, as Shiverella admitted, was the guy who made it happen. He shut down the county youth detention center. He wrote letters to the bank saying that we will, if you give the loan, we will send our kids to there. And then, of course, they went and were screaming at people to keep that place filled up. So the issue was fully addressed, and the admission was not inconsistent. What was Cunningham's sentence? 17 years on a plea. We asked the court. Question on statute of limitations on Count 7. That was preserved, was it not, the objection based on statute of limitations with respect to Count 7? It was, Your Honor. Was that properly denied, that motion to dismiss, on that basis, was that properly denied? Yes, it was, Your Honor. On what basis? As to Count 7 alone, well, Count 7, superseding indictment, was returned on September 29, 2010. Count 7 occurred in April of 2004. Now, you have to have, for a count, the count has to be within five years of the statute. Shivarella entered into a plea agreement on January 26, 2009. Yeah, you say that, and that they waived statute of limitations, but that plea agreement was not approved. That plea agreement was rejected by the court. It doesn't matter, because the plea agreement says if Shivarella vacates his plea of guilty... No, not if he vacates, it's if his conviction is vacated. But that anticipated that the plea agreement would be approved, and he would be convicted based on his guilty plea. And if that happens, then he, if it were vacated ultimately, even though he had pled, then that would be operative. But you can't say that the agreement in a plea agreement, which is rejected by the court, as to the waiver of defenses when he goes to trial is binding, can you? It was Shivarella after the plea, it was the Rule 11C nature that was rejected. It was Shivarella who withdrew his plea afterward. That is, he vacated and set aside his... He had his back up against the wall, didn't he? Well, that's what the plea agreement contemplated. But the judge was not going to accept the plea agreement. So the plea agreement was a nullity. I mean, it was conditioned upon the judge accepting the sentence, was it not? The plea, the Rule 11 part of it was. But it is not, and Shivarella could have said, okay, I'm staying with the agreement. Let's go forward with it, with that portion excised. Instead, he withdrew, vacated it, and according to that agreement, you withdraw it and vacated it, then we get to bring up the counts that we could have brought up. But Judge Rendell brought up the fact, it says the conviction is vacated. There was no conviction here. Well, if you look at the plea agreement, the plea agreement says that this plea is to be interpreted according to the sentencing guidelines. The sentencing guidelines says in Section 4A.1.2.A.4, a conviction means that a defendant's guilt has been established by a guilty plea. 4B.1.2.C says the date of conviction is the date of the plea. If we are interpreting the agreement by the sentencing guidelines, the sentencing guidelines defines a conviction as guilt established by a guilty plea. I think it would be pretty shocking to defendants to know that when they're entering in a plea agreement that needs to be approved by the court, that if they go to trial, they've waived all their defenses. Well, assuming we don't agree with that argument, would that count have to be vacated? Yes. We ask the court, however, to uphold the conviction and to deny the motions. Thank you. Thank you very much. Mr. Horne. Your Honor, in light of the additional six minutes you gave me, I just have a very brief comment, actually. I appreciate it. With regards to Mr. Zubrod's argument that the letters were released at the correct time, quite frankly, those letters should have been released shortly after the entry into that plea, and we should have known at that point in time what the judge's We never had that opportunity. And in fact, two weeks before sentencing, when the judge initially brought up about these letters, one thing he did not disclose in that meeting was that he had written any responses to those letters. And the letters and the release of those letters came about through a media request. That's how we found out that he was writing to people, is as a result of a media request, not by anything that he said. It's tough to say whether that's damning or not. I mean, you forget things. You say, gee, did I write that? I mean, I don't know. It's just tough to say that he was withholding purposely. And Judge, quite frankly, I've known Judge Kozak for a long time, and it's really hard for me to say that, too. But we're applying an objective standard. Yeah. No, absolutely. Yeah. If only we knew objectively what the answer is. You're right when you say judges judging judges. The other brief comment I'd like to make, Your Honor, deals with the cross-examination of both Owens and Powell on the embezzlement issue. That went to Powell's credibility. And no matter how weak the government thinks that argument may have been, the jury had a right to consider that in assessing the credibility of Robert Powell. They were not afforded that opportunity. Mr. Zubrod says that there was nothing in our case in chief to indicate where we wanted to go with this embezzlement theory. If you look at the record in this case, there is a lengthy colloquy that's put on the record indicating that we wanted to get into the specific records, the financial records of Western PA Child Care, to show how much money Robert Powell was embezzling. And we're talking around $3 million. We're not talking a couple dollars here. We were not allowed to do that. So all that is of record. We made that proffer. We did not proceed further because of the court's rulings. Thank you. Thank you. The case is well argued. We'll take it under advisement. Ask the clerk to recess for it. Thank you.